UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT

---
IN RE: )
) CHAPTER 11
MDM GOLF OF GILLETTE RIDGE, LLC, )
) CASE NO. 14-21565 (ASD)
    DEBTOR-IN POSSESSION. )
---
GRG ACQUISITIONS, LLC, )
)
    MOVANT, )
V. ) RE: ECF NO. 93
)
MDM GOLF OF GILLETTE RIDGE, LLC, )
)
    RESPONDENT. )
---

**BRIEF MEMORANDUM AND ORDER MODIFYING
THE AUTOMATIC STAY**

**I. INTRODUCTION**

After notice and a hearing commencing December 9, 2014, concluding December 17, 2014 (hereinafter, the "Hearing") to consider GRG Acquisitions, LLC's (hereinafter, the "Movant") *Motion . . . for Relief from the Automatic Stay* (hereinafter, the "Motion"), ECF No. 93, and MDM Golf of Gillette Ridge, LLC's (hereinafter, the "Debtor") *Objection to Motion . . . for Relief from the Automatic Stay* (hereinafter, the "Objection"), ECF No. 119, and the Court having heard and considered the evidence, documentary and testimonial, presented at the Hearing by the Movant and the Debtor through their respective attorneys, and having considered their pleadings, the Court issues this Brief Memorandum and Order.[1]

---

[1] In addition to the Motion, and at the suggestion of the parties, the Court first considered but has not yet resolved three *Motion(s) to Determine Secured Status*, ECF Nos. 67, 70 and 80 each filed by the Movant. In addition, consideration of the Movant's *Motion to Dismiss*, ECF No. 41, and the Debtor's *Disclosure Statement . . . Proposed by MDM Golf of Gillette Ridge, LLC* (hereinafter, the "Disclosure Statement"), ECF No. 61, while scheduled for consideration at the Hearing, has been held in abeyance pending the determination of the Motion.

## II. FINDINGS OF FACT

The following facts are derived from the evidence presented at the Hearing, and from undisputed facts, or facts which cannot be disputed, and/or from the Court's judicial notice of the files, records and docket of the case.

1. The Debtor, on August 4, 2014, commenced the instant bankruptcy case by the filing of a voluntary petition under Chapter 11 (hereinafter, the "Petition") designating the nature of its business as "Single Asset Real Estate as defined in 11 U.S.C. §101(51B)." Voluntary Petition, B1 (Official Form 1).[2]

2. The Debtor's "single asset" is real property located in the town of Bloomfield, Connecticut, as more particularly described in Exhibit B annexed to the Motion, which property is operated as a 18-hole golf course (hereinafter, the "Golf Course Property").

3. On or about February 15, 2008, the Debtor became indebted to Connecticut General Life Insurance Company (hereinafter, "Connecticut General") in the original amount of $4,500,000, as evidenced by a promissory note, annexed to the Motion as Exhibit A.

4. As security for its obligations under the Note, the Debtor executed and delivered to Connecticut General a Mortgage, Security Agreement, Assignment of Rents

---

[2]Bankruptcy Code § 101(51B) defines the phrase "Single Asset Real Estate" to mean:

> real property constituting a single property or project, other than residential real property with fewer than 4 residential units, which generates substantially all of the gross income of a debtor who is not a family farmer and on which no substantial business is being conducted by a debtor other than the business of operating the real property and activities incidental [thereto] . . . .

and Fixture Filing (hereinafter, the "Mortgage"), dated February 15, 2008, annexed to the Motion as Exhibit C.

5.  As further security for the Note, the Debtor executed and delivered to Connecticut General a UCC-1 financing statement (hereinafter, the "UCC-1 "), dated February 15, 2008 and recorded in Volume 1470 at Page 58 of the Bloomfield Land Records.  *See* Exhibit D, annexed to the Motion.

6.  The Movant's claim in this case is secured by an interest in the Golf Course Property by Connecticut General's assignment of the Note, Mortgage, UCC-1, and other related documents to the Movant on March 13, 2014.  *See* Exhibit E, annexed to the Motion.

7.  On March 19, 2014, the Movant commenced a state court foreclosure action related to the Golf Course Property (and certain personal property) in the Superior Court for the State of Connecticut, at Hartford (hereinafter, the "Superior Court"), Docket No. CV-14-6050052 (hereinafter, the "Foreclosure Action").

8.  In the Foreclosure Action, the Superior Court found the fair market value of the Golf Course Property to be $1,300,000.

9.  By order of the Superior Court dated June 30, 2014, a Judgment of Strict Foreclosure entered in the Foreclosure Action (hereinafter, the "Judgment"), wherein the Superior Court found the debt due to the Movant as of that date to be $4,151,456.63, together with an appraisal fee of $20,499.00, title fee in the amount of $150.00 and legal fees in the amount of $63,236.66.

10.  Pursuant to the terms of the Judgment, the Debtor had until August 4, 2014 to redeem the Golf Course Property, but it failed to do so.

11. The Debtor filed the Petition prior to the time that title to the Golf Course Property and the personal property vested in the Movant.

12. The Debtor filed its Chapter 11 Plan (hereinafter, the "Plan"), ECF No. 60, and related Disclosure Statement, ECF No. 61, on October 6, 2014, within 90 days of the entry of the order for relief in this case. *See* §362(d)(3)(A).

13. The Debtor has not commenced monthly payments as required by Bankruptcy Code §362(d)(3)(B).

14. The Debtor does not have equity in the Golf Course Property.

### III. DISCUSSION

With respect to a single asset real estate case, Bankruptcy Code Section 362(d)(3), *inter alia*, provides relief from the automatic stay of §362(a) as follows:

> (d) On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay -
>
> * * * *
>
> (3) *with respect to a stay of an act against single asset real estate* under subsection (a), by a creditor whose claim is secured by an interest in such real estate, unless, not later than the date that is 90 days after the entry of the order for relief (or such later date as the court may determine for cause by order entered within that 90-day period) or 30 days after the court determines that the debtor is subject to this paragraph, whichever is later -
>
>> (A) *the debtor has filed a plan of reorganization that has a reasonable possibility of being confirmed within a reasonable time*; or
>>
>> (B) the debtor has commenced monthly payments that -
>>
>>> (i) may, in the debtor's sole discretion, notwithstanding section 363(c)(2), be made from rents or other income generated before, on, or after the date of the commencement of the case

> by or from the property to each creditor whose claim is secured by such real estate (other than a claim secured by a judgment lien or by an unmatured statutory lien); and
> (ii) are in an amount equal to interest at the then applicable nondefault contract rate of interest on the value of the creditor's interest in the real estate;

(Emphasis added).

### A.      The Applicability and Meaning of Bankruptcy Code Section 362(d)(3).

"The purpose of section 362(d)(3) is to address perceived abuses in single asset real estate cases, in which debtors have attempted to delay mortgage foreclosures even when there is little chance that they can reorganize successfully. Section 362(d)(3) attempts to shorten such cases by requiring that the court grant relief from the stay if a reasonable plan is not filed promptly or payments are not commenced." Collier on Bankruptcy ¶362.07[5][b] (16th ed. 2014).

Incident to the Hearing, the Court had presented to it various and sundry evidence including the testimony and written appraisals of two appraisers[3] and of a management consultant[4] for commercial banks, and heard argument by the parties concerning the Motion and related matters. Certain facts found above, are particularly relevant to resolution of the Motion and are undisputed, namely, that the Debtor is a single asset real estate entity; has timely filed the Plan; has no equity in the Golf Course Property; and since the filing of the petition date it has made no payments to the Movant within the

---

[3] Laurence A. Hirsh (hereinafter, "Hirsh") and his Appraisal Report admitted in evidence as Exhibit A (hereinafter, the "Hirsh Appraisal"), presented by the Movant, and Jeffrey R. Dugas (hereinafter "Dugas") and his Appraisal Report admitted in evidence as Exhibit 1 (hereinafter, "Dugas Appraisal"), presented by the Debtor.

[4] David Etter (hereinafter "Etter").

5

meaning of §362(d)(3)(B).[5]  Thus, under the circumstances of this case, the focused issue now before the Court is whether the Plan has "*a reasonable possibility of being confirmed within a reasonable time*" as that phrase is used in §362(d)(3)((A). The Debtor conceded at the Hearing that it bears the initial burden on this issue pursuant to §362(g)(2).

In considering this issue bankruptcy courts have concluded that the standard for determining whether a plan has a *reasonable* possibility of being confirmed within a *reasonable* period of time is a lesser standard than that required to be shown at confirmation.  *See In re Windwood Heights, Inc.*, 385 B.R. 832, 838 (Bankr. N.D. W.Va. 2008) (discussing applicable case law). As noted in *Windwood,* "'[a]t a minimum the debtor must show that (1) it is proceeding to propose a plan of reorganization, (2) the proposed or contemplated plan has a realistic chance of being confirmed and (3) the proposed or contemplated plan is not patently unconfirmable.' *In re National/Northway Ltd. P'ship,* 279 B.R. 17, 24 (Bankr. D. Mass. 2002) (citations omitted)." *See also In re Harvest Oaks Drive Assocs., LLC*, No. 10-03145-8-SWH, 2011 Bankr. LEXIS 4630, at *7 (Bankr. E.D.N.C. July 26, 2011) ("the debtor must only show that it *can* propose a plan that has a reasonable possibility of being confirmed within a reasonable time"); *In re RIM Dev. LLC*, 448 B.R. 280, 288 (Bankr. D. Kan. 2010) ("This is a broad standard that requires the court to consider how the current plan stacks up against the confirmation requirements in §1129.  The debtor is not obliged to prove it will confirm the plan it has filed; instead the test is whether the plan is confirmable"), and *In re Carlsbad Dev. I, LLC*, 61 Collier Bankr. Cas. 2d (MB) 1181 (Bankr. D. Utah 2009).

As a next step, therefore, the Court must consider 11 U.S. C.§1129(a) which sets

---

[5] It appear that no mortgage payments have been made to the Movant since February 2013.

6

forth the requirements that must be met for the Plan to be confirmed.[6] The Movant has raised many possible impediments to the Plan's confirmation, and while the Court takes note of these, the Movant must establish only one such impediment that would bar the Plan's confirmation and not be readily subject to amendment or correction.[7] Distilled to its essence this Motion may be and is resolved by addressing just one element of §1129(a), namely, whether the Plan as proposed is "feasible," within the meaning of §1129(a)(11).

## B. The Debtor's Plan is Not Feasible.

In relevant part, the Plan first establishes the Movant's allowed claim to be in the amount of $4,274,794.[8] The Plan, presupposing that the Movant will make a §1111(b) election, treats the Debtor as fully secured but, for purposes of treatment under 1111(b), assumes that the Movant is secured in the amount of 1.3 million dollars and unsecured as

---

[6] Section 1129(a) lists sixteen requirements to be met. If all of these requirements except the unanimous acceptance of the plan by all the classes of claims or interests referenced in § 1129(a)(8) are met, the debtor may seek to cram down the plan by demonstrating that it is "fair and equitable" as that term is defined in §1129(b).

[7] Among the other alleged impediments to confirmation are the Debtor's separately classifying as "secured," two undisputedly unsecured creditors, Prime Bank and FPJ Investments, Inc., that are supportive of Plan confirmation, in violation of §1122(a). Nevertheless, as with additional defects pointed out by the Movant in its *Objection to Disclosure Statement*, ECF No. 104, the Code permits a Debtor to amend its proposed plan "at any time before confirmation," as long as it meets the requirements of §§1122 and 1123, and many of the defects described by the Movant are capable of amendment. 11 U.S.C. §1127(a).

[8] The Disclosure Statement actually "estimates" the claim to be $4,200,000 but there does not appear to be any dispute that the amount is as stated above.

to the rest.[9] It requires a payment of $300,000 to be paid on the effective date[10] toward the Movant's allowed secured claim in the amount of $1.3 million,[11] together with the delivery to GRG of a promissory note in the amount of $1 million, payable monthly with interest at 3% over 7 years, based on a 25-year amortization schedule. However, at the end of the 7-year Plan term, the remainder of the Movant's allowed claim, net of the treatment of the secured portion, would be due in full.  Based upon that proposed payment schedule, the Movant calculated, to which the Debtor at the Hearing agreed, that at the end of the 7-year Plan term, there will be a balloon payment due on the balance of the $1 million allowed secured claim in the amount of $795,458, which would be due together with the remainder of the Movant's allowed claim. At the end of 7 years, the total balloon payment due to the Movant would be the sum of the "unsecured portion" of its allowed claim ($4,274,794 - $1,300,000 = $2,974,794) plus the balloon payment due on the $1 million note in the approximate amount of $795,000 (the remainder of the secured claim, after payment of the

---

[9] Pursuant to section 1111(b)(1), where a debtor proposes to retain property, the creditor holding a nonrecourse claim secured by the property is entitled to have its claim allowed as if the creditor had recourse.  Although the creditor's entire claim becomes secured, the Debtor's plan is only required to provide payments that total the amount of the claim, but with a present value equal to only the secured claim.  Put another way, the present value of the electing creditor's stream of payments need only equal the present value of the collateral, which is the same amount that must be received by the non-electing creditor, but the sum of the payments must be in an amount equal [to] at least the creditor's total claim.

[10] This payment is supposed to come from a prospective purchaser of the Debtor, Golf At The Ridge, LLC, (hereinafter, the "Purchaser") which, in exchange for receiving all interests in the Debtor, will invest $1.3 million dollars in the entity, of which $300,000 would be paid to the Movant and the balance invested in making capital improvements on the Golf Course Property.

[11] The Debtor's appraiser, Dugas, appraised the Golf Club Property for the Tax Assessor for the Town of Bloomfield, Connecticut. The Dugas Appraisal valued the Golf Course Property at $2,450,000 in contrast to the Hirsch Appraisal which valued the Golf Course Property at $1,300,000. Exhibit A.  It is not necessary for the Court to reconcile the difference between these monetary amounts as at this point the Court concludes that even at the lower valuation of $1,300,000 which is the secured value used for Plan purposes, the Plan is not feasible.  If the Court were to accept the higher Dugas Appraisal figure of $2,450,000 that would require Plan payments to more than double over the seven years of the Plan but only modestly decrease the balloon payment.

8

proposed $300,000 cash at confirmation ($1,300,000 - $300,000 = $1,000,000) and after accounting for amortization on $1 million based on the 25-year schedule provided for in the Plan. That totals $3,770,252 ($2,974,794 + $795,458 = $3,770,252). Prime Bank, which the Plan also proposes to pay 3% a year over the 7-year period on its loan balance of $350,000, would also receive a balloon payment of $350,000, resulting in a total balloon payment (hereinafter, the "Total Balloon Payment") due under the Plan of approximately $4,120,252. See Plan, Section V, Treatment of Claims and Interests, ECF No. 60.

The Debtor's Disclosure Statement posits that it will be able to make the Total Balloon Payment either from the income it will have generated from its improved operation of the Golf Course Property, bolstered by the infusion of one million dollars of new capital from the purchaser, Golf At The Ridge, LLC, or from "equity in the Reorganized Debtor's property."[12] At the Hearing, the Debtor characterized that "equity" as being derived from new secured loans it intends to seek, if necessary, at the end of the seven year period.

The Court concludes that even under the lighter scrutiny that is to be applied in determining "reasonable possibility," the Plan does not realistically appear capable of meeting the feasibility requirement of §1129(a)(11). Subsection 1129(a)(11) sets forth a feasibility standard that requires that a plan not be likely to be followed by liquidation or the need for further financial reorganization. "[T]he feasibility standard is whether the plan offers a reasonable assurance of success. Success need not be guaranteed." *Kane v. Johns-Manville Corp.*, 843 F.2d 636, 649 (2d Cir. 1998). The inquiry is fact specific and requires the consideration of a number of factors. In this regard, evidence of an entity's past performance and credible projections of its future performance are useful indicators.

---

[12] The Debtor also references two potential lawsuits that it states it intends to file but one has since been abandoned and the other, a legal malpractice lawsuit, is entirely unexplained.

9

*Id.* Also relevant are such factors as economic conditions, the ability of the Debtor's management and whether the Plan depends upon occurrence of events that are within the control of the Debtor, rather than upon future events that are beyond the Debtor's control. ("A plan will not be feasible if its success hinges on future litigation that is uncertain and speculative, because success in such cases is only possible, not reasonably likely." *In re Am. Capital Equip.*, LLC, 688 F.3d 145, 156 (3d Cir. 2012).

At the Hearing, the Debtor (which has the burden of proof) presented evidence that was speculative at best. In support of its belief that its income will significantly increase due to the influx of new capital, the Debtor attached to its Disclosure Statement an Exhibit A (labeled and hereinafter, the "7 Year Pro Forma"), covering the years 2015 through 2021. For the years 2016 through 2021, it projected increasing rounds of golf being played each year, with five percent increases for the years 2016 through 2019, and three percent increases in 2020 and 2021. The total revenues projected over the next several years (if the revenues for 2012 and 2013 are averaged to be about 1.75 million each year, data for 2014 not being provided), while appearing very optimistic are not entirely unreasonable. However, going forward, the continuing anticipated annual increases become significant, in that they foresee by 2021 the annual revenues to be 2.3 million, an increase of about 22% over 2015. The main problem here is that the Debtor provided no credible evidence adequate to explain the basis for its belief that the Golf Course Property will produce such increasing revenue.

Further, the expenses are not broken down in sufficient detail to ascertain the reasonableness of the Debtor's anticipated expenses measured against its actual expenses

10

in the past.[13] It projects a yearly increase in expenses beginning in the 2016, ranging between 2 and 3% a year, but the figures appear purely speculative. Since the Debtor has not been operating post-petition there are no ways of measuring the projected costs by reference to Operating Reports. Moreover, in its Disclosure Statement, the Debtor indicated that one cause of its bankruptcy filing was the increase in costs of approximately 30% since it purchased the Golf Course Property in 2008, a number sharply higher than what it is projecting in the 7 year Pro Forma. Further, the projected profits constitute earnings before the deduction of interest, taxes and amortization expenses (EBITA).[14] Nor does it appear that the projected expenses include the Plan payments required to be made over the seven years of the Plan or any working capital, including that required for capital improvements such as for new equipment. "To establish feasibility, the debtor must present proof through reasonable projections, which are not speculative, conjectural or unrealistic, that there will be sufficient cash flow to fund the plan and maintain operations." *In re Leslie Fay Cos.*, 207 B.R. 764, 789 (Bankr. S.D.N.Y. 1997). Here, the Debtor's projections are speculative, conjectural and unrealistic.

Moreover, the Debtor's projections fly in the face of the Debtor's historical performance as even without making a single mortgage payment for almost one and a half

---

[13]The expenses listed in the 7 Year Pro Forma are inconsistent with the Hirsch Appraisal, p. 111, which in its cash flow analysis calculates expenses for 2015 to be approximately $134,000 higher than that shown on the 7 year Pro Forma for the same year.

[14]In his testimony, Hirsh made reference to his calculation in his appraisal at p. 103, that if the Golf Course Property were hypothetically "stabilized"(which he defined as when a golf course has a fair share of the marketplace, is accomplishing its fair share of rounds and is able to achieve an appropriate greens fee and revenue rate and builds on that over time), it could generate a profit ("Net Operating Income of Annual Operations") of approximately $161,207). That amount is below the figure of $176,081, projected by the Debtor in the 7 Year Pro Forma for 2015. Hirsh further testified that since the Golf Course Property is not yet stabilized, and is not likely to be until 2018, it is unlikely the Debtor could achieve in 2015 the $161,207, let alone the profit of $176,081 it projected.

years, the Debtor still could not pay its taxes, golf cart lease, utilities or suppliers. Based upon the Debtor's testimony through its Managing Member Matthew F. Menchetti (hereinafter, "Menchetti") since he assumed ownership of the Golf Course Property in 2008, with the possible exception of 2010, the Debtor has not had a profitable season. The closest it came was in 2010 when the Golf Course Property was, according to his testimony, in "immaculate" condition, and even then, if there was an profit in 2010, it was negligible. Thus, what past history of its operations is available, does not support the prospect that the Golf Course Property will be profitable in the future.

And while the Debtor is relying on the influx of capital from the new owner to support additional revenue, both appraisers who examined the Golf Course Property pronounced it as in being in bad shape, Hirsch characterizing the grounds as being in "poor" condition, with Dugas noting the course had "deteriorated significantly." Moreover, the Debtor has supplied no information or budgets documenting how the one million dollar investment is to be specifically allocated. And, although Menchetti testified to having worked with reputable and well known designers to plan significant and expensive improvements to the Golf Course Property, and generally described what capital improvements needed to be made, he also testified to the requisite necessity to reduce the scope of the proposed improvements because of the significant cost.

An additional factor relevant to determining reasonable assurance of success and thus feasibility is the role of management. *In re Leslie Fay Cos.*, 207 B.R. at 789. Here an new entity, Golf At The Ridge, LLC, not identified as being experienced in managing or owning golf courses will be assuming ownership. While Menchetti believes that he will be paying a role in future management of the course, there is no reference to that role in the

Disclosure Statement or Plan so there is no assurance as to what, if anything, the reorganized Debtor will do with Menchetti once it assumes control of the Golf Course Property. Furthermore, even should Menchetti continue to participate in managing the Golf Course Property, his past oversight,[15] and his failure to generate cumulative profit since he began operating the course, is not a factor that weighs in favor of the Debtor.

Nor did the Debtor present any credible evidence of its ability to obtain post-petition or post-confirmation financing.[16] There was no witness (other than Menchetti) testifying for the Debtor suggesting the opportunity for or likelihood of the Debtor receiving a loan of the kind and magnitude required either now or seven years hence. On the other hand, the Movant presented testimony from Etter, who, *inter alia,* as a consultant to commercial banks on their loan portfolios and other experience, and on the basis of his review of the Debtor's Disclosure Statement and the 7 year Pro Forma, the Hirsch and Dugas Appraisals, and other relevant financial documents, concluded that the relevant financials of the Debtor were "significantly inadequate" to support any loan to the Debtor as this time and, "very doubtful" to gain approval for a loan seven years hence.[17] Specifically, he testified that in order to make a four million dollar loan now or in the future, the Debtor would be expected to have a 75% loan to value, meaning the value of the property would

---

[15] In his testimony, Hirsh characterized the Golf Course Property as "under-managed."

[16] The only financial information of that sort presented to the Court was a letter from Farmington Bank, dated September 14, 2010, "provided for discussion purposes only" in which the bank discussed the possibility of making to the Debtor a mortgage loan of the "lesser of $4,750,000 or 65% (LTV (based on an updated appraisal). Aside from the questionable value of a four year old proposal, even if the letter had been dated a week ago, based upon the appraisals presented to the Court, the amount the Debtor would have been eligible to borrow would be significantly less than that needed to satisfy the debt of the Movant.

[17] Etter testified that in his 32 years of experience in commercial lending and credit, he has never seen a seven year forward commitment of a loan of the kind proposed here, and considered the supporting information for such a loan in this case "woefully inadequate" to underwrite a commercial mortgage.

have to be over five million dollars to support such a loan, and the Debtor would also have to document that its cash flow is 1.2 times the required debt service. None of this information is documented so as to allow him to even consider whether such a loan could be made now or in the future.

Finally, the Debtor's 7 Year Pro Forma projections that 24,703 rounds played in 2015 will increase by 7,152 to 31,855 rounds in 2021, are highly suspect due to the testimony of Dugas (who testified that there has been a downward trend in golf demand in Connecticut), and Hirsh (who noted that golf courses in general face difficult challenges in the current environment), even considering that general economic conditions have improved since 2008.

In determining feasibility, where the success is dependent upon factors that are totally beyond the control of the Debtor and/or, as in this case, are entirely speculative without any supporting evidence, courts look askance at a Debtor's almost total reliance on such a proposal to support a feasibility finding. "[A] plan based on impractical or visionary expectations cannot be confirmed. . . . [The President] testified that he had continuing contact with prospective investors.  But that unsubstantiated and optimistic testimony hardly rises to the level of orders in hand") (citation omitted) *In re Quigley Co.*, 437 B.R. 102, 141 (Bankr. S.D.N.Y. 2010); ("[T]he Debtors' vague presentation regarding its financing effort . . . is inadequate to show that there is a reasonable prospect that the Debtors can obtain the funds necessary to fully satisfy [the secured creditor's] undersecured claims. . . . The complete lack of detail . . . leads me to conclude that their prospects of raising the necessary funds . . .are too uncertain to justify permitting this case to proceed over [the secured creditor's] opposition"). *In re DCNC N.C. I, LLC*, 407 B.R. 651, 670 (Bankr. E.D. Pa. 2009).

Here, the facts, *inter alia*, that (i) significant factors are beyond the control of the Debtor, (ii) the Plan is speculative at best, (iii) Etter's credible testimony that the Debtor's financials are "significantly inadequate" to support any loan to the Debtor at this time, and "very doubtful" to gain approval for a loan seven years hence, and (iv) the totality of the evidence, compels the Court to conclude the Plan is patently unconfirmable, and therefore, presents no reasonable possibility of confirmation within a reasonable period of time.

## IV. CONCLUSION AND ORDER

In accordance with the discussion above, for cause pursuant to §362(d)(1), and as the present matter presents a "single asset real estate case" in which the Debtor's Plan is not attended by the requisite "reasonable possibility of being confirmed within a reasonable period of time" of §362(d)(3)(A), and the Debtor has not commenced the requisite monthly payments of §362(d)(3)(B),

**IT IS HEREBY ORDERED** that the Motion is **GRANTED**, – the automatic stay of §362(a) is modified to permit the Movant to continue to prosecute to conclusion (including any appeals) the Foreclosure Action, and otherwise exercise its rights, if any, with respect to the Golf Course Property in accordance with applicable state law, and

**IT IS FURTHER ORDERED** to the extent the Motion seeks a waiver of the 14-day automatic stay of Rule 4001(a)(3), it is **DENIED**.

Dated: December 23, 2014                                                              BY THE COURT

*Albert S. Dabrowski*
United States Bankruptcy Judge